IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DONNY FOSTER                                                                PLAINTIFF

V.                                           CIVIL ACTION NO.4:09CV127-SA-JAD

CARROLL COUNTY, MISSISSIPPI,
JERRY CARVER AND ROB BANKS                      DEFENDANTS

## REPORT AND RECOMMENDATION

      Donny Foster, apparently obsessed with his former live-in girlfriend and unwilling to accept her refusal to continue their relationship, absconded from his work while serving time at a restitution center with the Mississippi Department of Corrections. He went to her home and when the girlfriend did not appear Foster stole her van and was on the run from law enforcement for several days. While he was on the run the girlfriend's home burned to the ground. Foster, a previously convicted arsonist, called her to tell her about the fire. He tracked her down at her former husband's home. She was hit and slightly injured when she tried to stop Foster from leaving with her van.

      Foster was taken into custody after a series of on and off chases and standoffs involving three different law enforcement agencies. The standoffs lasted for well over an hour. When Foster finally exited the van, according to the affidavits of multiple law enforcement officers at the scene, he did so with gun in hand and pointed the gun in the direction of the officers. According to Foster he did not have the gun in his hands and he had his hands up in surrender for several minutes before being shot. One of two shots fired hit him in the leg. He was arrested and immediately transported to the hospital for treatment of his injuries.

Foster was indicted for the theft of the van, simple assault on a law enforcement officer and felony fleeing. He pled guilty to all three charges. He was sentenced to ten years on the auto theft charge, but only required to serve five years with five years of post release supervision. He received five year sentences on each of the other two charges which were imposed concurrently with the first sentence. It appears from a document submitted by Foster that this plea also disposed of any potential arson prosecution.

Foster has sued Rob Banks, the deputy sheriff who shot him, Jerry Carver, the sheriff of Carroll County and Carroll County. He asserts that excessive force was used in taking him into custody. He also asserts that his constitutional rights were violated by the failure of law enforcement to read him his *Miranda* rights following his arrest. The defendants have moved for summary judgment.

## 1. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "At the summary judgment state, [the court] require[s] evidence-not absolute proof, but not mere allegations, either." *Reese v. Anderson*, 926 F.2d 494, 400 (5th Cir. 1991). In reviewing the evidence, this court must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations or weighing of the evidence. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000). In so doing, the court must disregard all evidence

favorable to the moving party that the jury is not required to believe. *Id.* at 151. But the court is not bound to accept all admissible evidence in considering motion and opposition to the motion. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Another factor not present in every case impacts the standards applicable to reviewing this motion for summary judgment. In this case part of the evidence submitted in support of the defendant's motion for summary judgment is a videotape. Both sides agree that Foster was stopped initially then fled from the police and stopped again. Yet a third time Foster took off in his van and stopped a final time. The videotape begins with the arrival of one of the highway patrolmen sometime after Foster's initial stop. It ends after Foster is placed in the ambulance after being shot. This type of evidence is not treated like all other evidence on the motion for summary judgment. Videotaped evidence is not subject to outright falsehood, the bias of witnesses, the vagaries of their memories, nor the uncertainty created by a witness estimations of times, distances and sequences oif events. The court therefore may appropriately assign greater weight to the facts apparent in a video recording of an event. A videotape may well "provide indisputable evidence of what transpired." *Hudspeth vs. City of Shreveport*, 270 Fed.Appx. 332 (5th Cir. 2008). Therefore to the extent that any party's version of events is clearly contradicted by the video of the sequence of events, the court should not rely on what is clearly only "a visible fiction" in making its determination. *Scott*, 550 U.S. at 381.

3

## 2. THE MIRANDA CLAIM

The plaintiff makes two claims in his § 1983 action. He claims his rights were violated when law enforcement allegedly failed to read him his *Miranda* rights following his arrest. The *Miranda* warnings are a constitutional prerequisite to a valid custodial interrogation that will yield admissible statements. *Miranda v. Arizona*, 384 U.S. 436 (1966). Foster has not alleged that he was subjected to any interrogation by any defendant at the time of his arrest. He has neither asserted nor proven any policy of not reading *Miranda* warnings prior to interrogations. As the defendants point out to Foster pled guilty. Therefore there was no trial. There were no statements introduced against him. There is a complete failure of any proof to support a claim that there was a violation regarding *Miranda* warnings by any defendant to this action.

Additionally it appears that if Foster could prove a *Miranda* violation prejudicial to him, that such claim would be barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck* if a finding of liability on a § 1983 claim would necessarily impugn the validity of an existing conviction, the action is barred. A finding of prejudicial *Miranda* error would clearly call the validity of Foster's convictions into question and it is therefore barred under *Heck*. The defendants are entitled to summary judgment on this portion of Foster's claims.

## 3. EXCESSIVE FORCE

Foster claims that his constitutional rights were violated when the defendant Banks shot him. Because not all excessive force claims "are governed by a single generic standard," *Graham v. Connor*, 490 U.S. 386, 393 (1989), the first question to be answered is which standard applies to Foster's claims. Both sides in this case have argued as if there is no question that the Fourth Amendment standards control in this case. Under the Fourth Amendment standards excessive force

4

claims are determined under a standard of objective reasonableness. This standard applies to interactions between law enforcement and free citizens. The claims of inmates are evaluated under the Eighth Amendment's Cruel and Unusual Punishment Clause. The Fourth Amendment's standard is a much more generous standard from the viewpoint of any § 1983 plaintiff. Because Foster was an escapee from that the custody of Mississippi Department of Corrections it is not only a more generous standard but the wrong one.[1] Foster's claim can only arise under the Eighth Amendment. *Swinford v. Whitten*, 2011 WL 672597 (N.D. Miss., February 17, 2011) (claim of inmate- escapee injured during a scuffle with capturing sheriff's deputies was governed by the Eighth Amendment); *Gravely v. Madden*, 142 F.3d 345 (6th Cir. 1998) ("The use of excessive force to recapture a state escapee convict creates a different problem than the use of force to apprehend a nonviolent fleeing felony suspect. The Fourth Amendment is not triggered anew by attempts at recapture because the convict has already been "seized", tried, convicted, and incarcerated."). Applying the Eighth Amendment provisions Foster must make out a prima facie case that the force was applied, "maliciously and sadistically to cause harm," and " not in a good faith effort to maintain or restore discipline...." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992).

Because both sides have urged the court to evaluate this case under Fourth Amendment standards and because in this case application of the more lenient standard does not impact the outcome, the analysis is done under the Fourth Amendment's reasonableness standard.

---

[1] While Foster claimed in his guilty plea that he did not "abscond" from the restitution center he admitted that he walked off from his job site. It is also undisputed that he did not return to the restitution center from the work site. It is therefore undisputed that Foster was in fact an escapee at the time of his capture and when shot.

## **EXCESSIVE FORCE OR REASONABLE USE OF FORCE**

To make out the claim of excessive use of force, the plaintiff must prove a significant injury which resulted directly and only from a use of force that was clearly excessive and objectively unreasonable. *Carter v. Fenner,* 136 F.3d 1000, 1010 (5th Cir. 1998). There is no dispute that Foster sustained a significant injury and that the injury arose directly and only from the use of force, *Ramirez v Knoulton*, 542 F.2d 124 (5th Cir. 2008). The only question then is whether the use of force was so excessive as to be objectively unreasonable. *Id.*

In evaluating the reasonableness of the use of force the court must look at the issue from the perspective of the law enforcement officers at the scene and their actions may not be judged "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In determining whether excessive force has been used it must always be remembered that officers' jobs force them "to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary...." *Id.* at 397. Therefore "not every push or shove" or every shooting "even if it may later seem unnecessary in the peace of the judge's chambers," *Johnson v. Glick*, 41 F.2d 1028, 1033 (1973), violates the Fourth Amendment." *Id*. at 396. Even deadly force is not unreasonable where officers have probable cause to believe that an individual represents a serious threat to the safety of the officers or others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Under the reasonableness standard, the court must consider the severity of the crimes and "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. If the suspect threatens "the officers with a weapon... deadly force may be used if necessary." *Tennessee v. Garner,* 471 U.S. at 11.

## THE RECORD AND THE VIDEO

The first step in assessing the reasonableness of Deputy Banks' actions is to determine the relevant facts. Because Carol Connor refused to visit Foster or bring items he requested after he was sentenced to a restitution center, Foster walked off his job on May 18, 2009 in search of her. He says he went to her trailer home and waited for her. When she did not appear, he stole her van.

The next day between 10:00 and 10:30 a.m., Foster, who already had an arson conviction, arrived at Connor's residence and claims he found it burned to the ground and still smoking. He called Connor and asked her if she knew that her trailer had burned. This led to a report being made to Scott Beck, chief deputy of the Carroll County Sheriff's office. The van was then reported stolen. Connor told law enforcement that Foster had made earlier threats to burn her home. Foster, she reported, had demanded to know what man's clothing was in her living room, indicating that he had been in the home before it burned. Foster suggests in his assorted responses before this court that Connor burned her own home due to financial difficulties. This information was not available to law enforcement at the time of this incident so the affidavits of the officers stating that Foster was suspected of having burned the home at the time of the incident is undisputed.

Reports of further phone contacts by Foster with the victim were made on Thursday, May 21, 2009 and Saturday, May 23, 2009. At one point Foster demanded that Connor meet him at the burned out remains of her home in order to retrieve her van. Law enforcement was waiting for him instead, but he was not located until Sunday, May 24, 2009. At 11:00 that morning Carroll County Deputy Beck was alerted by Foster's former employer that he had been seen in the area driving Connor's van. Connor also called law enforcement and reported that Foster had tracked her to her former husband's home. She had been struck by the van as he left though not seriously injured.

7

Connor reported that Foster had called threatening to return to the home and promising a shoot out. At this point other law enforcement officers joined Beck in the search for Foster. It is undisputed that Foster was heading back toward Connor's location when he was stopped.

Beck's affidavit states Foster passed Beck going the other way at a high rate of speed. Foster almost forced him from the roadway. Beck says he turned his car around and activated his lights and siren but that Foster sped away. Foster denies that the lights or sirens were activated. He claims he thought he was being pursued by Connor's ex-husband or his friends. Claiming that this man had shot at him, Foster says he fled in fear for his life. [2]

Deputy Therrell Turner got Foster to stop on a rural gravel road. Within a matter of minutes Beck, state trooper Tony Dunn, and Leflore County Sheriff's Deputy Fred Randle also arrived at the scene. Dunn's car was equipped with video equipment. The video from Dunn's car is an exhibit to the summary judgment motion. The beginning of the video shows a couple of minutes of Dunn's car heading to the scene. It concludes after Foster is placed in an ambulance after the shooting. The video is about an hour and twenty-five minutes long. During the first twenty minutes or so the

---

[2] Foster acts as if he were innocent of any provocative behavior that would justify such a violent response. He apparently sees no problem with his conduct though reading his account of events it is clear that he was stalking this woman. He admittedly stole her van. He claims that he called her to make arrangements to return her van and to turn himself in to law enforcement. She refused to tell him where she was. He admits that he called her repeatedly and that she refused to answer his calls. He then tracked her down to the home of her former husband. He does not explain why he was calling her and not the sheriff if he wanted to surrender. There is also over an hour of videotape of him refusing to surrender to law enforcement and dozens of demands from him to speak with Connor face to face as a precondition to surrender. Foster has clearly lied to the court in his multiple responses to the motion for summary judgment as his versions of the events are contradicted by the video tape as will be discussed in detail. All in all, Foster has shown a Madoffian capacity for deceit and self delusion in seeking to cast himself as the victim, rather than the villain, in this series of events. If Connor's former husband pointed a gun at him or shot at him, it was an understandable, reasonable response in defense of Connor.

officers repeatedly tell Foster to get out of the vehicle and to throw down his weapon. Not only did the law enforcement officers speak with Foster but he repeatedly spoke with them. He repeatedly told them he would not comply with their demands either to throw out his gun or to step out of the van. The video shows two marked cars and one unmarked car, but the unmarked car has its lights flashing. Most of the officers visible in the video are in uniform. Foster could not have failed to recognize and understand that he was dealing with law enforcement officers.

Foster demanded that the officers bring Connor to him. Foster then cranked up the van. In response Deputy Randle shot out the passenger side tires. Foster drove further down the gravel road with the officers in pursuit for roughly a minute. Flashing lights are seen on the lead car and sirens are clearly heard.

Foster stopped again a second time for a couple of minutes but then just as abruptly drove off again. He stopped the last time within sight of a law enforcement blockade that had been set up to prevent him from getting back to the home where Connor had been staying. With law enforcement now in front of him and behind him, Foster continued to hold off the officers.[3] When this final phase of the standoff begins about 25 minutes have elapsed. Over the next hour the officers, primarily Dunn, the state trooper, continued to try to talk Foster into surrendering. They eventually brought Connor to the scene and she spoke with Foster via loud speaker also encouraging him to surrender. Foster repeatedly demanded that Connor and Dunn walk up to the van so that he

---

[3] Foster's gun was actually a pellet gun. The fact that it was not a regular gun is immaterial given his admission, under oath while pleading guilty, that it could not have been distinguished by the officers from a regular gun. Foster is heard on the video threatening to kill himself with the weapon. Additionally a picture of the gun is attached to the exhibits. The gun appears to be a real handgun.

could hand his weapon to the officer. This demand was repeatedly refused for obvious reasons. At one point during this final standoff Foster crawled into the back of the van. The officers scrambled for cover behind a car. One of the officers is heard commenting on the video that he saw a gun. The officers had witnessed Foster drinking beer during the standoff and throwing beer cans from the van so they were further on notice that Foster might be impaired.

At an hour and 12 minutes into the video Foster opened the van door and put his head and feet out of the van. Multiple voices yelled out to Foster to throw the gun down. By this point these demands have been repeatedly made for more than an hour without compliance. The officers are shown in the video again scrambling for cover. Off and on throughout large portions of the video one or more officers are seen with their weapons are drawn and aimed at Foster and/or the van. In this last few minutes the officers have their guns up and aimed most of the time. Foster is still not compliant with the officers' commands. Foster continued to demand that Connor come to the van to speak with him. During this time Foster got out of the van briefly. His hands are not up in the air. He then reentered the van.

At about an hour and sixteen minutes into the video, Foster got out of the van again. He is facing toward the officers in the video. Multiple voices simultaneously yelled at Foster to drop the gun. Shots rang out and Foster is seen falling down. Multiple voices continued to call out telling Foster to drop the gun, put his hands up and to not touch the gun. When the officers began approaching Foster his arms are clearly visible down by his side. After being shot, yelled at by multiple officers approaching him with their weapons drawn and aimed at him, Foster after some momentary hesitation raised his hands above his head. Dunn was the first officer to reach Foster and he is seen kicking what appears to be a gun away from Foster's side across a portion of the

gravel road. The object Dunn kicks is at Foster's side where his hand had been only seconds before.

In his response Foster says that he believed his life was in danger after a "heavy barrage" of gun fire and that law enforcement meant to kill or harm him. The only gun fire other than when Foster was shot came when his tires were shot out near the beginning of the video. Given the extended lapse of time between his tires being shot out and his exiting the van, any such fear was not reasonable but Foster claims he did not exit the van due to "excited delirium." He claims that he finally exited the van with the gun on the drivers side seat with his right hand on the driver's side door and his left hand in the air. He claims that he had his hands held in the air, with no gun in his hands. He claims to have been in this position for a number of minutes before Banks shot him. Foster's perceptions and his excuses and attempts to justify his own conduct are not material. The question is whether there is evidence to dispute the officers' claims that they reasonably believed Foster to represent a danger to them.

In truth the video is partially obstructed by the officers and it is difficult to see exactly what Foster was doing with his hands at the instant the shots are heard. Nonetheless no reasonable jury could accept Foster's version. First there is the chorus of voices telling him to put down the gun. The shots ring out, not minutes, but seconds later. The officers continue yelling at Foster to put his hands up and to drop the gun as they approach him. Most tellingly and irrefutably there is the clear evidence of Dunn kicking the gun away from Foster's side. Foster claims that the gun was in the van when he was shot and that Dunn deliberately kicked dirt in his face, not a gun. He attempts to put forward a theory that the officers staged the scene and that the gun was never kicked across the road. The video shows that Foster is a liar. The gun was in his hand and he was facing officers with

11

it in his hand when he was shot. No fantastical and nonsensical conspiracy theory can rebut the video showing the gun, not dirt flying in response to Dunn's kicking motion.

The officers reasonably would be expected to perceive that Foster was at that time a serious threat to their lives and safety. Nothing that Foster has offered materially disputes the circumstances faced by the officers or the reasonableness of their actions. Over an extended period of time Foster refused to surrender or throw down his weapon. The officers witnessed him drinking during this time. They heard his threats to commit suicide. All attempts to reason with him over an extended period of time had been unavailing. Foster had created the "tense, uncertain and rapidly evolving" circumstances placing the officers in apparent hazard for extended period time. Foster created the dangerous circumstances that required these officers with their own lives at risk to make split second decisions regarding use of potentially lethal force. There is no material dispute based on the videotape that Foster had the gun in his hand and was facing the officers. He was still armed when he was shot. Whatever Foster may say about his intentions now, he objectively represented a serious risk of death or injury to any officer present at the scene. He created "the whole sequence of events" that culminated in his being shot.

One Fifth Circuit case is so factually similar to Foster's claim as to dictate the granting of summary judgment based on what is seen in Foster's video. In *Ramirez v. Knoulton,* 542 F.3d 124 (5th Cir. 2008) Ramirez was under investigation on serious charges. When he told an officer on the telephone that he was not going to jail, that he had a gun and that he was going to "take care of the problem," the officer, believing that Ramirez intended to commit suicide, dispatched officers to his home. Foster openly was threatening to commit suicide. The officers had received reports from Connor of threats of serious violence having been made against her that day. The officers

intercepted Foster heading back towards Connor, consistent with the alleged threat communicated to them by Connor. Foster kept demanding that Connor be brought into his presence and continuously demanded that she walk up to him for a face-to-face chat while he was apparently armed. Any reasonable officer would have understood that Foster represented a potential danger to Connor.

In *Ramirez* the officers arrived at the suspect's home as he was leaving in his car. The officers put on their lights. Ramirez did not stop immediately. Unlike Foster, Ramirez's chase was all low-speed and he obey traffic signs along the way. Ramirez and Foster both stopped in remote locations. The officers in *Ramirez* crouched behind their patrol cars. So did the officers in Foster's video. They told Ramirez to keep his hands where they could be seen and to reach out and through the window to open the car door. Ramirez like Foster repeatedly ignored these commands. Unlike Foster, Ramirez' period of noncompliance was a matter of a minute or so. Ramirez just like Foster opened the door and placed both feet on the ground. Because the officers saw something in Ramirez's hand they like the officers in Foster's case "yelled more urgently for Ramirez to raise his hands." *Id*. at 127.

Ramirez then got up from the car seat. The officers told him to drop what he had in his hands. Ramirez did not comply but turned toward the officers at which point they could see he had gun. In Foster's case by comparison the officers knew early on that he had gun on him. Foster had refused to surrender himself or his weapon for well over an hour.

Ramirez then stood in profile from the viewpoint of the officers with a gun at his side away from the officers. Foster was facing toward the officers with a gun in his hand. Ramirez put his hands on his hips briefly then moved his hands toward one another. Ramirez was then shot in the

13

face. Foster was shot in the leg. The officers got close enough to Ramirez to remove the handgun. He was then transported to a hospital and like Foster survived his injuries. Ramirez was shot two minutes after the initial stop and about 10 seconds after he stepped from the car. Foster was shot about an hour and a half after the initial stop but a matter of seconds after he had stepped from the van the second time.

In *Ramirez* summary judgment was denied by the trial court. The trial court had reasoned that because Ramirez had not raised, discharged, or pointed his weapon at the officers that the force used in shooting Ramirez could be found by a jury to have been excessive. The trial court also faulted the officer for not using a hostage negotiator or nonlethal force in attempting to our arrest Ramirez. In Foster's case the officers spent well over an hour attempting to negotiate Foster's surrender. They used nonlethal force in shooting out the tires to slow Foster's potential escape. They made the important concession of bringing Connor to the scene and with her cooperation attempted to bring the standoff to a peaceful resolution. The officers in this case did what the trial court in *Ramirez* had faulted the officers for not doing.

The Fifth Circuit Court of Appeals, reversed the trial court finding that the officers were entitled to summary judgment. Quoting from *United States v. Sharp*, 470 U.S. 675, 686-87 (1985), the Fifth Circuit noted "A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. [Citations omitted]. The question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Ramirez*, 542 F.3d at 120-130. In Foster's case there would be even less justification for failing to grant summary judgment given that the alternatives suggested by the trial judge in *Ramirez* had already

been exhausted in Foster's case. The Fifth Circuit's pithy comment that "The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists," *Id*. at 130, applies with equal or greater force to Foster's case.

Even in the calm of a judge's chambers it takes little imagination to picture how quickly the gun in Foster's hands could be pointed and death or serious injury visited by the culpable–Foster– upon the innocent–the law enforcement officers trying to apprehend him. *Scott v. Harris,* 550 U.S. 372, 384(2007)("We think it appropriate ... to take into account not only the numbers of lives at risk, but also their relative culpability." "Culpability is relevant ... to the *reasonableness* of the seizure– to whether preventing possible harm to the innocent justifies exposing to possible harm the person threatening them.")

Foster's swearing to events and circumstances inconsistent with the videotape does not suffice to create a bona fide dispute about the material facts. Under the undisputed facts no reasonable jury could find that the use of force in this case was clearly and unreasonably excessive. The work of fiction offered by Foster is opposition to the motion must be disregarded and summary judgment entered for all defendants.

## THE GUILTY PLEA

Independent of the evidence offered by the affidavits of the officers involved and independent of the videotape of the events of May 24, 2009, the defendants are entitled to summary judgment. Foster pled guilty to charges that established his own actions during this chain of events–actions which as a matter of law justified the use of deadly force against him. Foster was charged with the simple assault of the defendant Banks. While not every conviction of simple assault will be fatal to a claim of excessive use of force by law enforcement, the guilty plea to this

15

particular charge dictates the outcome. Foster was charged by indictment of "purposely or knowingly attempt[ing] to by physical menace to put Rob Banks ... in fear of imminent serious bodily harm to-wit: by pointing a gun at Rob Banks...." In his petition to enter a guilty plea Foster stated under oath that he was guilty as charged. In taking his plea the prosecuting attorney read the exact charge on the record. The state's tender of proof from the prosecuting attorney was as follows:

> [T]his defendant, I believe, was working at a restitution center and left the restitution center and went to Ms. Carol Connor's residence and stole her van. And then took law enforcement on a high speed chase, which resulted in the felony fleeing charge. And then once they got him boxed in to stop, he had what appeared to be a firearm and was waving it around and put these officers in fear of serious bodily injury.

The court then asked Foster if he agreed with the proffered proof. Foster responded:

> BY THE DEFENDANT: Sir, I didn't escape from the restitution center. I was out working. I left my job. I didn't escape from the restitution center. I took Ms. Connor's van. And it was not the same day. And the gun that was in the van was a pellatt (sic) gun. It wasn't, which the officers didn't know. I told them that if I didn't get to talk to Carol I was going to kill myself.
> BY THE COURT: So other than the fact that you did not escape from the restitution center, you pretty much agree with the facts?
> BY THE DEFENDANT:     Yes, sir.
> BY THE COURT: ...[A]nd are you pleading guilty to these charges because you are in fact guilty?
> BY THE DEFENDANT: Yes, sir.

These admissions made under oath remove all doubt that Foster place the officer who shot him in fear for his safety. Foster is bound by those assertions made under oath and will not be allowed to defeat a motion for summary judgment by submitting a contradictory story in this action. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984); *S.W.S Erectors, Inc. v. Infax, Inc.*, 72 F 3d 489, 496 (5th Cir. 1996); *Russell v. Harrison,* 736 F.2d 283, 287 (5th Cir.1984) (Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists.) *Kennett-Murray Corp. v. Bone,* 622

F.2d 887, 894 (5th Cir.1980). *See also Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657 (11th Cir.1984)*Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128, 137 n. 23 (5th Cir.), *cert. denied,* 506 U.S. 845, 113 S.Ct. 136, 121 L.Ed.2d 89 (1992).

Because shooting someone who was pointing a gun in his direction was an objectively reasonable use of force by Rob Banks, as a matter of law, and therefore there is no violation of Foster's constitutional rights, Rob Banks and the other defendants are entitled to summary judgment on the excessive force claim based solely on Foster's guilty plea.

## *HECK V. HUMPHREY AND FOSTER'S CLAIMS*

Foster attempts to avoid the effect of his admissions in his guilty plea by launching a collateral attack on his plea and convictions. He requests that two of his three convictions be set aside in one of his multiple responses. This is a § 1983 action, not a habeas action. This court cannot, within this action, grant habeas relief. The proper parties are not before the court. There has been no showing of compliance with the multiple procedural prerequisites to seeking habeas relief in federal court. Also a §1983 action is not a proper vehicle through which to seek habeas relief . A response to a motion for summary judgment would never be the appropriate vehicle for raising such a claim. But Foster's attempt to have this court set aside two of his three convictions does amount to a confession that the conviction of assaulting the defendant Banks by pointing a gun at him stands as a bar to Foster's claim of excessive use of force claim by the officer. Because a recovery by Foster on this § 1983 claim would necessarily impugn the simple assault conviction, and because that conviction has not been reversed or otherwise invalidated, there can be no § 1983 liability under *Heck v Humphrey*, 512 U.S. 477 (1994)*.*

## THE SHERIFF AND THE COUNTY

Without a triable issue of fact on either the *Miranda* or excessive force claim, the sheriff who had no personal involvement and the county can have no liability to Foster. Even if Foster had shown triable issues of fact as to Banks, the remaining defendants would still be entitled to summary judgment. In a § 1983 action the employers and supervisors cannot be held liable for the actions of employees under a respondeat superior theory of liability. *Monell v. Department of Social Services*, 436, U.S. 658, 98 S. Ct. 2018, 56 l. Ed. 611(1978). Foster has not produced any evidence to support a jury verdict finding any unconstitutional policies or practices by the sheriff or Carroll County.

## CONCLUSION

The undersigned recommends that the defendants' motion for summary judgment [75] be granted. The complaint should be dismissed with prejudice. Because this action is frivolous, the undersigned recommends that it be counted as a strike against Foster pursuant to the provisions of the Prison Litigation Reform Act.

## RECOMMENDATIONS REGARDING OTHER PENDING MOTIONS

Based on the foregoing recommendation the undersigned recommends that the motion number 70 (affirmative motion *in limine* seeking a ruling that proposed plaintiff's exhibits be admitted) be denied as moot.

Motion 91 and document 93 [denominated as a supplement to 91] attempt to seek habeas relief from this court. The defendants have moved to strike these documents as an improper surrebuttal filed without leave of court. As noted in the report and recommendation, the court cannot grant relief based upon these documents. They are also n improper surrebuttal. The motion to strike these documents [106] should be granted.

In motion number 99 the plaintiff seeks to strike Exhibits G and H to the defendant's motion for summary judgment alleging that the blood taken from him and the subsequent testing for blood alcohol content was done in violation of his Fourth Amendment rights. The defendants have conceded that these exhibits are not material or necessary to the determination of the court. They have not been considered. The motion should be granted based solely on the lack of materiality.

Motions no. 113 and 118 seek to strike additional improper surrebuttals filed by the plaintiff being documents 111 and 117. These motions to strike should be granted.

Motion no. 120 (defendants seek leave to file a supplemental brief in support of the motion for summary judgment) should be denied.

Plaintiffs motions 123 and 128 are denominated as motions for leave to file supplemental responses but are substantive responses to the proposed supplemental response by the defendants that is the subject of motion no. 120. Because the proposed supplement has never been accepted for filing motions no. 123 and 128 should be struck by the court *sua sponte*.

In motion number 134, the defendants seek to strike two newspaper articles attached to a response to one of the motions to strike [132]. These exhibits are not germane to the motion to strike and the supposed response to the motion to strike is yet another attempt by the plaintiff to supplement the response to the motion for summary judgment without obtaining leave of the court. For that reason the motion to strike should be granted. Additionally the newspaper articles are hearsay regarding another later event involving other personnel and are not relevant to the issues in this action. For these additional reasons the motion to strike should be granted.

The parties are referred to 28 U.S.C. § 636(b)(1) and Local Rule 72(a)(3) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations.

Objections are required to be in writing and must be filed within fourteen days of this date. Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of filing will bar an aggrieved party from challenging on appeal both the proposed factual findings and the proposed legal conclusions accepted by the district court. *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Plaintiff is directed to acknowledge receipt of this report and recommendation by signing the enclosed acknowledgment form and returning it to the court within fourteen days of this date. Plaintiff is warned that failure to comply with the requirements of this paragraph may lead to the dismissal of this lawsuit under F.R.Civ.P. 41(b) for failure to prosecute and for failure to comply with an order of the court.

This the 23rd of day of June, 2011.

/s/ JERRY A. DAVIS
UNITED STATES MAGISTRATE JUDGE